# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

ROGER PORTELL,           )
                                   )

    **Plaintiff,**             )
                                   )

    v.                     )     **Case number 4:06cv0911 TCM**
                                   )

MICHAEL J. ASTRUE,      )
**Commissioner of Social Security,[1]**   )
                                   )

    **Defendant.**            )

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security ("Commissioner"), denying the application of Roger Portell for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-433, is before the Court[2] for a final disposition. Mr. Portell has filed a brief in support of his complaint; the Commissioner has filed a brief in support of his answer.

## Procedural History

Roger Portell ("Plaintiff") applied for DIB in January 2005, alleging he was disabled as of December 2002 by blindness in his left eye, degenerative joint disease, hip and lumbar strain, right shoulder strain, chondromalacia, depression, high blood pressure, arthritis in his

---

[1]Mr. Astrue was sworn in as the Commissioner of Social Security on February 12, 2007, and is hereby substituted as defendant pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

[2]The case is before the undersigned United States Magistrate Judge by written consent of the parties. See 28 U.S.C. § 636(c).

neck, thyroid problems, ulcers, and knee, back, hip, shoulder, and neck problems.  (R. at 96-98.)[3]  This application was denied initially and after a hearing held in August 2005 before Administrative Law Judge ("ALJ") Jhane Pappenfus.  (Id. at 15-58, 74-76.)  The Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner.  (Id. at 5-8.)

## **Testimony Before the ALJ**

Plaintiff, represented by counsel, was the only witness to testify at the administrative hearing.

Plaintiff testified that he lived in a house with his wife, daughter, age sixteen, and son, age eight.  (Id. at 29.)  He had completed the twelfth grade and had some additional vocational training in office skills.  (Id. at 30.)  He had been in the military and was receiving 100% disability from the Veterans' Administration ("VA").  (Id. at 31.)  Asked by the ALJ about a report he had received unemployment compensation in the first quarter of 2004, Plaintiff explained that he had had to stop working in December 2002 and received unemployment benefits only for the first few months of 2003.  (Id. at 31-32.)

When Plaintiff worked as a foreman truck driver, he supervised from four to ten men.  (Id. at 33.)  He worked as a truck driver for a plumbing company for the first and second quarters of 2004.  (Id. at 34-35.)  He had worked for the City of St. Louis for eleven years, but had been discharged after he started having problems falling and climbing ladders.  (Id. at 36.)  Specifically, he was having problems with his knee giving out, with his hip following

---

[3]References to "R." are to the administrative record filed by the Commissioner.

surgery, and with standing or walking.  (Id. at 37-38.)  Currently, his most significant

problem was with his lower back.  (Id. at 38.)  The back pain was a seven to eight on a ten-

point scale.  (Id. at 39.)  Because of this pain, he could not usually stand for longer than

twenty or thirty minutes.  (Id.)  He also could not sit up straight because of the back pain.

(Id. at 42.)  To help relieve the pain, he applied Ben Gay patches and soaked in Epsom salts

for an hour every other day.  (Id.)  His back became disabling after he took the job at Fayette.

(Id. at 40.)  Although he was supposed to work only as a truck driver, within a few weeks

of being hired, he was doing heavy lifting.  (Id.)

When he was participating in vocational rehabilitation, he had problems with back

when he had to sit for awhile.  (Id. at 43.)  Also, his legs would tighten up, causing him to

have to get up and move around.  (Id.)

The past year, he had cortisone shots in both knees and his right shoulder.  (Id. at 43-

44, 46.)  Additionally, he has arthritis in his right wrist and thumb and wears a brace.  (Id.

at 43-44.)  This causes him problems operating zippers.  (Id. at 44-45.)  He is ambidextrous,

and does some things with his right hand, e.g., shaving, and some with his left hand, e.g.,

brushing his teeth.  (Id. at 45.)

Plaintiff uses a cane when at home.  (Id. at 46.)  At best, he can walk a half-mile

without a cane.  (Id. at 47.)  His doctors want him to walk a mile, but he cannot physically

do that.  (Id.)  He has a rowing machine at home.  (Id.)  His doctors want him to use it for

thirty minutes, but he can only use it for ten before having to stop because of the knee pain.

(Id.)  His doctors wanted him to take a stress test for his heart, but the pain in his knee

stopped him after a few steps.  (<u>Id.</u> at 47-48.)  He can stand for twenty to thirty minutes and can sit in a recliner for an hour or two.  (<u>Id.</u> at 55.)

His right shoulder "pops in and out of place."  (<u>Id.</u> at 48.)  He has learned from a chiropractor how to "pop" it back in place.  (<u>Id.</u>)

In addition to these problems and being completely blind in his left eye, Plaintiff sprained his ankle in April.  (<u>Id.</u>)  His doctor told him he has gout in both ankles.  (<u>Id.</u> at 49.)  His blood pressure drops if he gets up too quickly from a sitting position.  (<u>Id.</u> at 49-50.)  He takes medication for high blood pressure.  (<u>Id.</u> at 50.)

Asked to described his pain on a scale of one to ten, with ten being the greatest, Plaintiff replied that it was an eight if he was not taking pain medication and a five if he was.  (<u>Id.</u> at 51.)

Asked if he was alleging any mental impairments, Plaintiff's attorney replied he was not.  (<u>Id.</u>)  Plaintiff was not seeing any counselor.  (<u>Id.</u> at 52.)  He had been given medication for depression, but had been told to stop taking it.  (<u>Id.</u>)

Asked to describe a typical day, Plaintiff testified he gets up between 4:30 and 5:00 in the morning.  (<u>Id.</u> at 52-53.)  He sits and watches televison until time to wake up his children.  (<u>Id.</u> at 53.)  He takes his son to summer school, returns and wakes his wife up for work, then sits and watches television until approximately 10:00 in the morning.  (<u>Id.</u>)  He takes a nap until noon, when he wakes up and makes lunch.  (<u>Id.</u>)  He sits and watches television until time to pick his son up from school.  (<u>Id.</u>)  On his return home, he occasionally tries to make dinner.  (<u>Id.</u>)  And, he sits and watches television and tries to do

- 4 -

some exercise.  (<u>Id.</u>)  He occasionally does some laundry.  (<u>Id.</u> at 54.)  He does not do any shopping.  (<u>Id.</u>)  His neighbor mows his lawn; his wife takes care of the two dogs and cat. (<u>Id.</u>)  He goes to church every Sunday, attends his son's soccer games, and attends monthly parent-teacher meetings.  (<u>Id.</u>)  He waters his rose bushes.  (<u>Id.</u> at 56.)  He has difficulty sleeping.  (<u>Id.</u> at 56-57.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to his application, records from various health care providers, and reports of consultants.

On a function report, Plaintiff stated that because of his impairments, he no longer could work, bowl, go for long walks, play with his children, go camping, or work around or on his house.  (<u>Id.</u> at 159.)  The meals he prepared for himself were cereal, sandwiches, or microwaved dishes.  (<u>Id.</u> at 160.)  He had worn knee braces since 1989; a neck brace since September 2004; and a walker, crutches, and cane since October 2001.  (<u>Id.</u> at 162.)

After the initial denial of his DIB application, Plaintiff completed another disability report.  (<u>Id.</u> at 107-13.)  He reported that his knees had gotten worse after February 9, 2005, and his doctor recommended limited stair climbing, a cane, and braces.  (<u>Id.</u> at 107.)  He had difficulty tying shoes, putting on socks, and clipping his toe nails.  (<u>Id.</u> at 111.)  Arthritis in his knees, right hip, and right shoulder made it hard for him to move or to sleep at night. (<u>Id.</u>)

Plaintiff's earnings statement reflect annual income that usually increased between the years 1978 through 2002. (Id. at 83.) In 2002, his reported annual earnings were $43,275. (Id.) Those earnings were $3,876 in 2003 and $5,115 in 2004. (Id.) Plaintiff explained his earnings in 2003 as being vacation and sick pay earned from the job he left in December 2002. (Id. at 142.) His earnings in 2004 were from a job he had to quit because of his medical condition. (Id. at 143.)

Unless otherwise noted, Plaintiff's medical records are from the VA Hospital.

The earliest record is that of Dale E. Doerr, M.D.,[4] dated March 2, 2001, and is described as a follow-up visit of "a patient who is status post avascular necrosis[5] of the femoral heads with a groin pull." (Id. at 407.) Plaintiff was described as doing fine but having some difficulties going up and down ladders and steps. (Id.) X-rays indicated that the necrosis was healing. (Id.) He was to return to work as tolerated, with minimal ladder climbing and no jackhammering. (Id.) The following month, Plaintiff informed Dr. Doerr that he was continuing to have difficulties with his right hip. (Id.) On examination, he had a "somewhat decreased range of motion." (Id.) He was to return to his activities as tolerated and return to Dr. Doerr the next month. (Id.) When he did, he reported difficulty in the area

---

[4]Plaintiff was referred to Dr. Doerr by Alexander Rudoi, M.D. Dr. Rudoi's treatment records begin April 2001 and primarily concern complaints unrelated to the impairments at issue. (See id. at 415-24.)

[5]Avascular necrosis is the "[p]athological death of one or more cells or of a portion of tissue or organ, resulting from irreversible damage" caused by a "deficient blood supply." Stedman's Med. Dictionary, 1179 (26th ed. 1995).

of the greater trochanteric bursa[6] in his right hip.  (Id.)  He was given a steroid injection at the site.  (Id.)  At the conclusion of the next month's follow-up visit, when Plaintiff reported that his hip was doing better than before the surgery, Plaintiff was released to return to full activities as tolerated and was to return in three months.  (Id. at 406.)

When Plaintiff did return, in October, he complained of right groin pain beginning a few weeks before when he was climbing down off a ladder.  (Id.)  Dr. Doerr opined that he had a right groin muscle pull, prescribed a muscle relaxer, and had him do stretching exercises given him by physical therapy.  (Id.)  At Plaintiff's next visit, in January 2002, Plaintiff reported continuing problems with his right hip and right groin.  (Id.)  On examination, he had a decreased range of motion in his right hip and was walking with a limp.  (Id.)  X-rays revealed the beginning of degenerative arthritic changes in both hips, with the right worse than the left.  (Id.)  He was given samples of Vioxx.  (Id.)

When Plaintiff returned to Dr. Doerr in April he was doing better and had only mild complaints of pain.  (Id. at 405.)  He had a good range of motion in his right hip and, with the exception of three or four days during the past three months, "had been getting along quite well."  (Id.)  He had not been regularly taking the Vioxx until recently and wanted to take it only on an as needed basis.  (Id.)  Dr. Doerr agreed.  (Id.)  Plaintiff was to return as needed.  (Id.)  Four months later, he did, reporting that he had been doing well until two weeks ago when he began to work twenty to thirty hours of overtime.  (Id.)  He had difficulty

---

[6]The greater trochanteric bursa is a bursa, "a closed sac or envelope lined with synovial membrane and containing fluid," found in "a strong [projection or outgrowth] at the proximal and lateral part of the shaft of the femur[.]"  Id. at 252, 1429, 1857.

walking, standing, and going up and down steps.  (Id.)  He had a decreased range of motion in the hip and was tender with extremes of motion.  (Id.)  X-rays revealed "only mildly increased degenerative arthritic changes of the right hip."  (Id.)  Dr. Doerr opined that he should not be working more than a forty-hour week and gave him a note to that effect.  (Id.)  The note also restricted him from ladder climbing, more than minimal stair climbing, and any excessive walking or standing.  (Id.)

Plaintiff next saw Dr. Doerr four months later, on December 27.  (Id. at 404.)  He had a decreased range of motion and strength in his right shoulder and tenderness in his left hip with motion.  (Id.)  X-rays revealed mild degenerative arthritic changes in the hip.  (Id.)  He was to return to activities as tolerated and to start physical therapy for his shoulder.  (Id.)

Plaintiff went to the VA without an appointment on December 30 to request physical therapy, as suggested by Dr. Doerr.[7]  (Id. at 395-97.)  He had fallen before Thanksgiving and had injured the shoulder.  (Id. at 395.)  He was assigned a primary care physician and scheduled for a new patient appointment.  (Id. at 396.)  X-rays of his right shoulder revealed

_____

[7]Although the VA records refer to Plaintiff as being a new visit, his VA medical records include those of X-rays of his hips on October 15, 2002, to determine if his degenerative joint disease was worse or if the femoral head in his right hip had collapsed.  (Id. at 207-08.)  It was concluded that the disease had probably not changed from a December 2001 study (id. at 210-11), and that the right femoral head was intact with no evidence of collapse.  (Id. at 208.)  The same day, x-rays were taken of his lumbosacral spine and knees.  (Id. at 208-10.)  Mild degenerative endplate changes were seen at L3-4 and L4-5.  (Id. at 209.)  X-rays of his knees were normal.  (Id. at 210.)  The 2001 x-rays of Plaintiff's right hip revealed postsurgical changes of cord decompression, a fairly normal appearing femoral head, minimal spur formation, and mild degenerative changes at the right acetabulum.  (Id. at 210-11.)

no evidence of bone or joint pathology and minimal osteoarthritis in his acromioclavicular joint.  (Id. at 205-07.)

Plaintiff began occupational therapy on January 10, 2003.  (Id. at 393-95.)  He reported that he had injured his shoulders, his right more than his left, after falling down steps on November 26, 2002. (Id. at 393.)  He took pain medication, used topical cream, and soaked in a tub with hot water to relieve the pain.  (Id.)  He was not able to move his right shoulder to any degree or to lift heavy weights.  (Id.)  His pain was currently a four or five on a ten-point scale, with ten being the worst, and, at worst, was an eight or nine.  (Id.)  On January 27, Plaintiff reported to the therapist that his right shoulder pain was worse.  (Id. at 392.)  He could not tuck in his shirt or reach to the side.  (Id.)  The flu prevented him from doing his home exercise program.  (Id.)  He tolerated the treatment well and reported decreased pain at the end.  (Id.)  He had twelve additional occupational therapy session between February 20 and May 5, inclusive.  (Id. at 373, 377-85.)  Although he generally tolerated the treatments well and his pain usually decreased, it was not alleviated.  (Id.)

The day of his second session, February 20, Plaintiff consulted his primary care physician, requesting physical therapy for his right shoulder and reporting no improvement with the last cortisone injection.  (Id. at 386-91.)  X-rays of his chest revealed no acute abnormality of his heart and lungs.  (Id. at 203-04.)  X-rays of his knees were also normal.  (Id. at 204-05.)  He was started on a medication, Levothyroxine, for hypothyroidism.  (Id. at 389.)

Shortly after beginning occupational therapy, on February 27, Plaintiff underwent a magnetic resonance imaging ("MRI") of his right shoulder, at the request of Dr. Doerr. (Id. at 410.) The findings were of extensive changes of tendinosis, a small partial-thickness tear in his rotator cuff, and arthrosis of the acromioclavicular joint. (Id.)

The same day as his last occupational therapy session, May 5, Plaintiff saw his primary care physician with complaints of an attack of gout – the first he had experienced – the week before and of indigestion. (Id. at 373-77.) The dosage of one of his medications was increased, one medication was discontinued, and two others were added. (Id. at 376.)

Plaintiff consulted his primary care physician on July 21 for pain in both knees and pain in his right shoulder, despite having had three cortisone injections in the shoulder. (Id. at 365-69.) He was to see a non-VA doctor on July 29 for the shoulder. (Id. at 365.) On examination, he had a decreased range of motion in his right shoulder and was able to abduct to only 90 degrees. (Id. at 367.) His dosage of one medication was increased; another medication was added. (Id. at 368.) He was to decrease his consumption of beer to two or three per week. (Id.)

At the suggestion of his doctor, Plaintiff began occupational therapy for his right shoulder on August 20. (Id. at 362-64.) He had been swimming and doing water exercises two or three times a week and had been receiving acupuncture once a week. (Id. at 363.) Both had helped. (Id.) At present, the pain in his right shoulder was a two or three on a ten-point scale and at its worst was a five to six. (Id.) He participated in occupational therapy on a weekly basis beginning August 25 and ending November 5. (Id. at 351-56, 360-62.)

Before this last session, Plaintiff had greatly improved, having a decrease in pain and an increase in his range of motion and strength. (Id. at 352.) "He was able to do activities that he had initially not done." (Id.) At the last session, however, he reported increased pain in his right shoulder. (Id. at 351.) His physician wanted to give him another cortisone shot. (Id.) The occupational therapist recommended further medical intervention. (Id. at 352.)

While participating in occupational therapy, Plaintiff consulted his primary care physician about abdominal bloating and discomfort for the past few days and a knot in his right elbow for the past six months. (Id. at 356-60.) His medications were adjusted and his elbow was x-rayed. (Id. at 358.) The x-rays were normal. (Id. at 203.)

On November 10, Plaintiff contacted the VA about trouble sleeping. (Id. at 349-51.) He had been averaging only two to three hours of sleep a night for the past three weeks. (Id. at 350.) He could not wait to be seen, but said he would call the doctor about treatment options. (Id. at 350-51.)

Three days before this visit to the VA, Plaintiff returned to Dr. Doerr for pain in his right shoulder. (Id. at 403.) He explained that he had reached over to pick something up in a heavy bag and had felt something tear. (Id.) On examination, he had a decreased range of motion and decreased strength in the right rotator cuff. (Id.) Dr. Doerr opined that he had a full thickness rotator cuff tear and scheduled him for an arthroscopic evaluation and probable repair. (Id.) The evaluation and repair were performed on November 19. (Id. at 408-09.) One week later, Plaintiff informed Dr. Doerr that he had been doing all right until the weather changed and became colder. (Id. at 402.) There was tenderness with motion of

the shoulder, but a good range of motion.  (Id.)  The incisions were well healed.  (Id.)  He was to participate in physical therapy and return in one month.  (Id.)  The next record, however, is from February 2004 when Plaintiff reported an almost-full range of motion, had "very little complaints of pain," and had no tenderness.  (Id. at 401.)  He was to return only as needed and was released to return to work without restrictions.  (Id. at 401, 411)

As recommended by Dr. Doerr, Plaintiff began physical therapy on December 8, 2003.  (Id. at 346-48.)  He reported that his symptoms had markedly improved since the surgery; however, his shoulder became worse with cold.  (Id. at 346.)  He also reported that he had no activities of daily living or recreation.  (Id.)  His right shoulder was tender on palpation, and was slightly limited in its range of motion.  (Id.)  At his next session, on December 23, Plaintiff reported that his shoulder was without pain on some days and with pain on others.  (Id. at 344.)  He associated the pain with weather and cold.  (Id.)  He had also been doing some heavy lifting.  (Id.)  At the end of the session, he was pain free.  (Id.)  At the session the following week, Plaintiff continued to complain of tightness across his anterior right shoulder.  (Id. at 343.)  He did not complain of pain.  (Id.)  After his January 5, 2004, session, the physical therapist noted that Plaintiff's range of motion and strength in his right shoulder were increasing.  (Id. at 341-43.)  The next week, Plaintiff reported that his shoulder no longer hurt.  (Id. at 335-36.)  Three days later, on January 15, Plaintiff complained of constant soreness in his right shoulder that day; he attributed the change from the day before to the weather.  (Id. at 334.)  He also reported poor compliance with his home exercise program.  (Id.)  At his next session, on January 20, he reported complying with that

program.  (Id. at 333.)  He also, however, continued to do his own exercises despite being advised not to.  (Id. at 333-34.)  At his session three days later, Plaintiff again attributed soreness in his right shoulder to the weather.  (Id. at 332-33.)  After cancelling his next appointment, Plaintiff reported at his January 29 session that he played darts the night before and had no pain.  (Id. at 331.)  He had not been able to do so before his surgery.  (Id.)  He was to return to his "outside" physician on February 3.  (Id.)

While participating in physical therapy, Plaintiff went to his primary care physician for a check-up.  (Id. at 336-40.)  He had been fired from his job in November 2002.  (Id. at 336.)  He was then taking twelve medications.  (Id. at 337.)  On examination, he had a good range of motion in his right shoulder.  (Id. at 339.)

Plaintiff consulted his primary care physician on March 11 about right knee pain for the past day, occasional right hip pain, and problems with his right knee occasionally giving out and his right shoulder "popping" with movement.  (Id. at 327-30.)  He had started a new job that week driving trucks.  (Id. at 327.)  He was no longer taking an anti-depressant, citalopram, and his mood was fine.  (Id.)  He was encouraged to go on a low sodium, low fat diet. (Id. at 330.)  Two medications were discontinued, including the citalopram, and two were added.  (Id.)  An x-ray of his liver revealed a coarse hepatic acoustic texture suggestive of fatty infiltration, cirrhosis, or hepatitis.  (Id. at 202.)

On May 10, Plaintiff complained to his primary care physician about low back pain for the past month caused by shoveling rock.  (Id. at 320-24.)  The pain was not relieved by acetaminophen, although it had been better for one to two days following his three visits to

a chiropractor.  (Id. at 321.)  On examination, his lumbar spine was tender on palpation and he had a muscle spasm in his lumbar area.  (Id. at 323.)  He was prescribed Flexeril, a muscle relaxer, and told to return in four months.  (Id.)  X-rays of his right shoulder taken on June 8 showed post-surgical changes of acromioplasty without any signs of acute abnormality.  (Id. at 201-02.)

An annual eye-exam on June 23 showed the vision in his right eye to be 20/20 with glasses.  (Id. at 315-20.)

Plaintiff was admitted to the VA hospital on July 9 after he went to the emergency room reporting a three-day history of dizziness.  (Id. at 200-01, 212-17, 282-314.)  Once during that three-day period he had one syncopal, or loss of consciousness, episode.  (Id. at 212, 284, 287, 290, 307.)  He had a history of hypertension, hypothyroidism, degenerative joint disease, and depression.  (Id.)  The first two were described as "well controlled"; the third as "controlled"; and the fourth as "not currently being treated."  (Id. at 212.)  He also had a history of surgery on his right hip and on his right shoulder.  (Id. at 213.)  He was blind in his left eye due to a motor vehicle accident.[8]  (Id.)  He had some right ear tenderness the past week after swimming.  (Id. at 213, 287.)  On examination, he had a good range of motion in his neck, but a limited range of motion in his right shoulder due to a rotator cuff injury.  (Id. at 214.)  A computed tomography ("CT") scan of his head was normal.  (Id. at 200-01, 216.)  A stress treadmill test was negative.  (Id. at 216, 217.)  He was discharged on July 12 with hypertension medication and a low salt diet.  (Id. at 212, 217, 262-82.)

_____

[8]This accident happened in 1972.  (Id. at 315.)

An ultrasound of Plaintiff's carotid arteries was performed on July 13. (Id. at 199-200.) Minimal calcified atherosclerotic plaques were seen. (Id.)

On July 22, Plaintiff consulted his primary care physician about back and knee pain, trouble sleeping, mild dizziness, tightness in the back of his neck, and occasional shortness of breath on exertion but relieved with rest. (Id. at 259-62.) He was compliant with his nine current medications. (Id. at 259-60.) A chest x-ray was normal. (Id. at 196-97.) X-rays of his cervical spine showed reduced disc space at C4-C5, consistent with degenerative joint disease. (Id. at 198.) Posterior osteophytes (bony growths) were at C4-C5 and in the margins of C3 through C7. (Id.) X-rays of his right knee revealed minimal degenerative changes in both patellae. (Id. at 198-99.) The diagnosis was arteriosclerosis. (Id.) He was referred to the neurology and orthopedic clinics, discontinued on one medication, added on two others, and told to stop drinking. (Id. at 262.)

Plaintiff went to the neurology clinic on August 2 for a follow-up for his hospitalization, complaining of pain in the back of his neck. (Id. at 251-59.) One medication was discontinued; another added. (Id. at 252.) He was currently prescribed at least nine medications, including two for pain; two for blood pressure; one for mood and sleep; one for allergies; a muscle relaxer; and an anti-inflammatory. (Id. at 253-54.) He was described as right-handed. (Id. at 256.) An MRI of his head was deferred due to his claustrophobia. (Id. at 257.)

On August 18, Plaintiff went to the orthopedic clinic for complaints of right shoulder and bilateral knee pain. (Id. at 248-51.) He had decreased strength in his right arm and was

- 15 -

unable to lift it over his shoulder without discomfort.  (Id. at 248.)  He denied any numbness, tingling, popping, or locking.  (Id.)  He also had discomfort with weather or temperature changes.  (Id.)  The diagnosis was degenerative joint disease in both knees and tendonitis in his right shoulder.  (Id. at 250.)  Treatment for the knees was cortisone injections and braces; treatment for the shoulder was a cortisone injection and therapy.  (Id.)

Plaintiff began physical therapy for the tendonitis in his right shoulder on August 25. (Id. at 245-47.)  He reported that his shoulder had been doing well after the rotator cuff repair in November 2003 until he began lifting 85 pound bags in a new job.  (Id. at 245.)  He was described as ambidextrous.  (Id.)  A cortisone shot the week before had helped.  (Id.) His pain was currently a three on a ten-point scale.  (Id.)  Plaintiff reported at the next session, on August 31, that his shoulder was feeling better.  (Id. at 244.)  On September 3, he reported recently falling on his left shoulder.  (Id.)  Four days later, he described his right shoulder pain as a four on a ten-point scale.  (Id. at 243.)  Throwing darts with his right hand hurt his shoulder.  (Id.)  At his September 10 session, his pain was a one on a ten-point scale. (Id. at 242.)  Three days later, Plaintiff reported that he was "much improved since starting [physical therapy]."  (Id. at 240.)  His right shoulder was sore after he washed his car the day before; his pain was a two on a scale of one to then.  (Id.)  He was compliant with his home exercise program.  (Id.)  It was noted that he had decreased complaints during his activities of daily living and an increased range of motion.  (Id. at 241.)  His goal was to be pain free. (Id. at 240.)  The next day, Plaintiff was given a right knee brace that had been fitted a few weeks before.  (Id. at 239, 248.)  The following day, he reported at his physical therapy

appointment that he had no complaints.  (Id. at 238.)  The therapist noted that all goals had been met.  (Id. at 239.)

Plaintiff consulted his primary care physician on September 20 about a rash on his back and arms, burning pain in both knees after walking ¼ mile, right shoulder pain, and low back pain on his right.  (Id. at 234.)  He was not taking his medications as ordered.  (Id.)  He requested a transcutaneous electrical nerve stimulation ("TENS") unit.  (Id.)  X-rays of Plaintiff's right hip revealed a small osteophyte in the articular surfaces of the inferior femoral head.  (Id. at 195.)  X-rays of his lumbar spine showed "relatively mild degenerative endplate changes" with "probable mild facet degenerative changes on the right at L5-S1." (Id. at 196-95.)  One medication, Naproxen, an anti-inflammatory, was discontinued; vitamin D and Salsalate, an anti-inflammatory and  pain reliever, were added; and other medications were continued.  (Id. at 237.)  A nursing note indicated that the generalized joint and muscle pain and the low back pain were of less than one year's duration, were aggravated by standing and walking, and were not relieved by anything.  (Id.)

On September 23, Plaintiff went to the cardiology clinic for a follow-up on his syncopal episode.  (Id. at 228-33.)  He was "advised to refrain from rising quickly and to increase fluid intake when working in heat."  (Id. at 231.)

Four days later, Plaintiff was given a TENS unit for control of his right shoulder pain. (Id. at 226-28.)  He reported that he had had the pain for two years and it was exacerbated by playing darts.  (Id. at 226.)  Sitting at rest in the clinic, the pain was a two on a ten-point scale.  (Id.)

Plaintiff consulted a neurologist at the VA on October 25 for a follow-up of his syncopal episode. (<u>Id.</u> at 224-26.) He reported that he had had no more episodes and his dizziness symptoms were better. (<u>Id.</u> at 224.) He had an unrelated pain in the back of his neck "with questionable radiation to his right arm/hand." (<u>Id.</u>) His right arm and hand were weak, and he had diffuse joint pain. (<u>Id.</u>) His strength in his right upper extremities was 4/5, compared to 5/5 in his left upper extremities. (<u>Id.</u> at 225.) He also had decreased sensation in his right upper extremities compared to his left upper extremities. (<u>Id.</u>) He was discharged from neurology for the syncopal episodes, but was to be referred to his primary care physician for evaluation of his right shoulder joint and for pain management. (<u>Id.</u>)

Consequently, on November 21, Plaintiff consulted his primary care physician about pain in his right shoulder. (<u>Id.</u> at 220-24.) He reported that his shoulder was "popping in and out of place" and his hand would become numb when that happened. (<u>Id.</u> at 220.) He had found out the week before that he would receive disability from the VA. (<u>Id.</u>) His dosage of Levothyroxine was decreased; he was placed on a low carbohydrate, low sugar, and low fat diet and told to exercise; and he was to be scheduled for a CT scan of his right shoulder. (<u>Id.</u> at 22-23.)

On January 14, 2005, Plaintiff underwent an electroencephalogram; it was normal. (<u>Id.</u> at 192-93.)

On February 9, Plaintiff complained to his primary care physician of pain in his right knee and low back since falling down the stairs two weeks before. (<u>Id.</u> at 189.) He had gone to a chiropractor and both were feeling better. (<u>Id.</u>) He also had pain in his left knee for the

past two weeks, and had a sore throat, nasal congestion, productive cough, and chills and sweats for the past two weeks. (Id.) He did not have any chest pain, shortness of breath, or syncopal episodes. (Id.) His chest x-ray and electrocardiogram ("EKG") were normal. (Id. at 191.) His medications were continued with the addition of Augmentin. (Id.) A depression screening was negative. (Id. at 192.)

Knee braces were ordered for Plaintiff on March 3. (Id. at 182.) On March 9, his primary care physician declined to give Plaintiff a release for jury duty because the physician did not see a reason why Plaintiff could not perform it. (Id. at 187.) Two days later, Plaintiff had a steroid injection in his knees and right shoulder. (Id. at 188.)

Three to four weeks after twisting his ankle, Plaintiff went to the VA on May 2 to have it x-rayed. (Id. at 179, 184-86.) There was no fracture or swelling and the bones were anatomically aligned. (Id. at 179.) There was some vascular calcification. (Id.) He was to wrap the ankles, apply ice, and do range of motion exercises. (Id. at 185.)

On June 8, Plaintiff had a steroid injection in knees and right shoulder. (Id. at 175-76.) He was to return in three months. (Id. at 176.) On June 9, Plaintiff was fitted with an ankle brace. (Id. at 175.) The next day, he consulted a physician in the cardiology clinic. (Id. at 174-75.) He reported a history of syncope, hypertension, hypothyroidism, and depression, "among other medical problems." (Id. at 174.) Plaintiff also reported that "his lightheadedness ha[d] improved markedly since last year" and he "denie[d] subsequent syncope." (Id.) He walked ½ to ¾ miles daily without chest pain, dyspnea, or lightheadedness, but with "considerable bilateral knee pain." (Id.) He was 40 pounds above

his ideal weight.  (Id.)  The physician discussed with Plaintiff a calorie reducing diet and an aerobic exercise program.  (Id. at 175.)  No return visit was scheduled.  (Id.)

In addition to the records described above, between January and May and again in July 2005, Dr. Matthew Sherrill, D.C., treated Plaintiff monthly for low back pain and right shoulder pain.  (Id. at 168-69.)  He treated Plaintiff three times in June.  (Id.)

The ALJ also had before her correspondence from an instructor with the Office of Computer and Administrative Skills Training program at MERS/Missouri Goodwill Industries to the VA in August 2004 to report that Plaintiff's physical problems with his shoulder, back, and knees prevented him from completing the program.  (Id. at 101.) Specifically, his legs and knees became stiff if he sat for an hour or longer and his shoulder and back were painful when he was sitting at a computer.  (Id.)  The instructor concluded that Plaintiff had "physical limitations that affect his ability to perform both labor intensive and sedentary work[.]" (Id.)  Another instructor with the program wrote separately and added Plaintiff's physical problems, including numbness in his hands, caused him to be unable to sit in front of a computer for longer than an hour without having to get up and move around for fifteen minutes.  (Id. at 102.)  Plus, his absenteeism would be a problem for any employer.  (Id.)

In addition to the records of Plaintiff's treatment by various health care providers and the correspondence summarized above, the ALJ also had before her the reports of two consultants.

In February 2005, R. Taxman, an internal medicine specialist, completed a Physical Residual Functional Capacity Assessment of Plaintiff. (Id. at 114-22.) The primary diagnosis was degenerative joint disease; the secondary diagnosis was hypertension; and additional impairments in his right hip and right shoulder. (Id. at 114.) These impairments resulted in exertional limitations of being able to occasionally lift twenty pounds, frequently lift ten pounds, and sit, stand, or walk about six hours in an eight-hour workday. (Id. at 115.) He had no manipulative, visual, environmental, or communicative limitations. (Id. at 117-18.) Although he was blind in his left eye, he did not allege any problems with depth perception and was driving. (Id. at 117.) He could frequently climb, stoop, kneel, crouch, and crawl, although his right shoulder could cause him difficulty when climbing ladders. (Id. at 116.)

The following month, Terry L. Dunn, Ph.D., completed a Psychiatric Review Technique form ("PRTF") for Plaintiff. (Id. at 123-36.) Dr. Dunn concluded that Plaintiff had an affective disorder, depression, that was not severe. (Id. at 123, 127.) Specifically, Plaintiff's depression resulted in a mild restriction of his activities of daily living, moderate difficulties in maintaining social functioning, and no difficulties in maintaining concentration, persistence, and pace. (Id. at 133.) There was insufficient evidence about whether the depression caused any episodes of decompensation of any duration. (Id.)

**The ALJ's Decision**

First noting that Plaintiff was born on April 2, 1952, and had past relevant work as a foreman, water maintenance worker, pipe fabricator, and laborer, the ALJ concluded that

his income in 2003 was vacation and sick pay from his former employer and his income in 2004 was from an unsuccessful work attempt.  (Id. at 16.)  He had not, therefore, engaged in substantial gainful activity since his alleged onset date of December 10, 2002.  (Id.)

The medical evidence established that he had severe impairments of (i) a history of hypertension; left eye blindness; right rotator cuff tear, status post surgical repair; right hip surgery due to avascular necrosis; and back and bilateral knee pain, with surgery to the left knee in 1996, and (ii) osteoarthritis.  (Id.)  His depression, right ankle sprain, and gout were not severe impairments.  (Id.)  These impairments did not meet or equal a listed impairment. (Id. at 17.)

The ALJ then addressed the question whether these impairments precluded Plaintiff from performing his past relevant work or other work.  To answer this question, she first had to assess his residual functional capacity ("RFC").  (Id.)  She summarized Plaintiff's description of his RFC as being able to stand for thirty minutes, sit for two hours, walk ½ to ¾ mile, and lift up to fifty pounds.  (Id.)  Also, he had to sit in a recliner for a total of approximately four hours each day.  (Id.)

The ALJ found this testimony and that about an inability to perform any type of gainful work not to be credible.  (Id.)  She explained her finding as follows.  Although Plaintiff had a good work history, he was currently receiving $2,589.00 monthly in VA disability benefits; these benefits might reduce his incentive to work.  (Id.)  His daily activities, specifically, his return to work and his participation in the three-month training program, were inconsistent with his testimony.  (Id. at 18.)  Also, he left his job with the City

because the employer could not accommodate his request that he not be required to climb ladders, he applied for unemployment benefits and received them for one to two months after he left that job, and those benefits stopped because he was then participating in the training program. (<u>Id.</u> at 19.) In addition to the receipt of unemployment benefits indicating an ability to work, the ALJ also noted that Plaintiff had testified that he believed when he went to work for the plumbing company in 2004 that he would be driving a truck and not doing any heavy lifting. (<u>Id.</u>) It was the latter requirement that caused him to quit that job. (<u>Id.</u>)

The ALJ next noted that, regardless of Plaintiff's complaints of debilitating pain, Plaintiff had not had physical therapy for his shoulder since January 2004 or for his right hip after the conclusion of the therapy sessions following his September 2000 surgery. (<u>Id.</u>) Moreover, there were inconsistencies in Plaintiff's testimony. (<u>Id.</u>) Specifically, he did not take his pain medication regularly and took it only at night because it made him drowsy; however, he had trouble sleeping at night. (<u>Id.</u>) He did not take his pain medication if he was going to drive; however, he drove his son back and forth from school every day. (<u>Id.</u>) He also was driving a truck until the third quarter of 2004. (<u>Id.</u>) Although he testified that his pain was an eight without medication, he did not take the medication regularly. (<u>Id.</u>)

Plaintiff did, the ALJ further found, have "orthopedic abnormalities which result in some limitations." (<u>Id.</u> at 20.) These abnormalities did not preclude all work activity. (<u>Id.</u>) Insofar as the right hip was concerned, the records indicated sporadic medical treatment during the relevant period and a successful right hip surgery. (<u>Id.</u>) Insofar as the right shoulder was concerned, Plaintiff did well after the rotator cuff surgery and was allowed to

return to work in February 2004.  (<u>Id.</u> at 21.)  Insofar as his back and knees were concerned,

Plaintiff had very sporadic medical treatment for either during the relevant time period.  (<u>Id.</u>)

There was no recommendation for physical therapy or surgical intervention, and the records

indicated that the back pain had started after Plaintiff shoveled rock.  (<u>Id.</u>)  Insofar as

Plaintiff's complaints of dizziness were concerned, there was also minimal medical treatment

and he denied any subsequent syncopes after the one in July 2004.  (<u>Id.</u>)  Insofar as his left

eye blindness was concerned, Plaintiff had worked for many years with this problem and was

able to drive.  (<u>Id.</u> at 22.)  The ALJ also noted that Plaintiff's primary care physician at the

VA declined to excuse him from jury duty in May 2005 on the grounds that there was no

reason for doing so.  (<u>Id.</u>)

The ALJ next noted that she had considered the VA's finding of disability and the

correspondence from the vocational instructor.  (<u>Id.</u>)  The first was not controlling; the

second was accorded little weight.  (<u>Id.</u>)

The ALJ then found that Plaintiff had the RFC to perform light work with only

occasional bending, stooping, crouching, crawling, kneeling, climbing, and balancing

required.  (<u>Id.</u>)  The ALJ further found that Plaintiff could not, therefore, return to his past

relevant work and the burden shifted to the Commissioner to establish that there were jobs

he could perform in the national economy.  (<u>Id.</u> at 22-3.)  Given his age, 53 years' old, his

high school education and some vocational training in computer and administrative skills,

his RFC for light work, application of Rule 202.14 of Appendix 2[9] and 20 C.F.R. § 404.1569 directed a finding that he was not disabled.

## Legal Standards

Under the Social Security Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. § 1382c(a)(3)(A).  The impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(B) (alteration added).

The Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. § 404.1520.  See also **Johnson v. Barnhart**, 390 F.3d 1067, 1070 (8th Cir. 2004); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002).  "Each step in the disability determination entails a separate analysis and legal standard."  **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006).  First, the claimant cannot be presently engaged in "substantial gainful activity."  See 20 C.F.R. § 404.1520(b).  Second, the claimant must have a severe

---

[9]Rule 202.14 of Appendix 2, also referred to as the Medical-Vocational Guidelines, or Grid, directs a finding of not disabled for a person limited to light work as a result of severe medically determinable impairments; who is closely approaching advanced age, such as Plaintiff, with a high school education or more; and who is skilled or semi-skilled but without transferable skills.

impairment. <u>See</u> 20 C.F.R. § 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities. . . ." <u>Id.</u> (alterations added). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on h[is] ability to work." **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001) (alteration added).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. <u>See</u> 20 C.F.R. § 404.1520(d), and Part 404, Subpart P, Appendix 1. If the claimant meets this requirement, he is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

At the fourth step, the ALJ will "review [claimant's] residual functional capacity ["RFC"] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e) and 416.920(e) (alterations added). "[RFC] is what the claimant is able to do despite limitations caused by all the claimant's impairments." **Lowe v. Apfel**, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)) (alteration added). "[RFC] 'is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **Ingram**

**v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (quoting <u>McCoy v. Schweiker</u>, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)) (alteration added).  Moreover, "[RFC] is a determination based upon all the record evidence[,]" not only medical evidence.  **Dykes v. Apfel**, 223 F.3d 865, 866-67 (8th Cir. 2000) (alterations added).  Some medical evidence must be included in the record to support an ALJ's RFC holding.  **Id.** at 867.  "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record.  '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'"  **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting <u>Frankl v. Shalala</u>, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility.  **Ramirez**, 292 F.3d at 580-81; **Pearsall**, 274 F.3d at 1217.  This evaluation requires that the ALJ consider "(1) a claimant's daily activities, (2) the duration, frequency, and intensity of pain, (3) precipitating and aggravating factors, (4) dosage, effectiveness, and side effects of medication, and (5) residual functions."  **Ramirez**, 292 F.3d at 581 (citing <u>Polaski v. Heckler</u>, 739 F.2d  1320, 1322 (8th Cir. 1984) (subsequent history omitted)).  Although an ALJ may not disregard subjective complaints of pain based only on a lack of objective medical evidence fully supporting such complaints, "an ALJ is entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary."  **Id.**  <u>See</u> <u>also</u> **McKinney v. Apfel**, 228 F.3d 860, 864 (8th Cir. 2000) ("An ALJ may undertake a credibility analysis when the medical

evidence regarding a claimant's disability is inconsistent.").  After considering the <u>Polaski</u> factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

Additionally, the evaluation during the administrative review process of the severity of a mental impairment in adults must follow the technique set forth in 20 C.F.R. § 416.920a. This technique requires that the claimant's "pertinent symptoms, signs, and laboratory findings" be evaluated to determine whether the claimant has a medically determinable impairment.  <u>Id.</u> § 416.920a(b)(1).  The degree of functional limitation resulting from this impairment must then be rated.  <u>Id.</u> §§ 416.920a(b)(2) and (c).  This rating follows a specific format, identifying four broad functional areas and analyzing the degree of limitation in each area imposed by the mental impairment.  <u>Id.</u> §§ 416.920a(c)(3) and (4).  The degree of limitation in the first three areas is rated on a five-point scale:  "[n]one, mild, moderate, marked, and extreme."  <u>Id.</u> § 416.920a(c)(4).  The degree of limitation in the fourth area, episodes of decompensation, is rated on a four-point scale:  "[n]one, one or two, three, four or more."  <u>Id.</u>  A rating of "none" or "mild" in the first three categories and "none" in the fourth will generally result in a finding that the mental impairment at issue is not severe.  <u>Id.</u> § 416.920a(d)(1).  On the other hand, if the mental impairment is severe, the medical findings about that impairment and the resulting limitations in the four functional areas are to be compared "to the criteria for the appropriate listed mental disorder."  <u>Id.</u>

§ 416.920a(d)(2).  If the claimant has a severe mental impairment that does not meet or equal the severity of any listing, then the claimant's residual functional capacity is to be assessed. Id. § 416.920a(d)(3).  Section 416.920a(e) requires that the application of this technique be documented.  An ALJ is to document the application in his or her decision.  Id.

The burden at step four remains with the claimant.  **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001); **Singh**, 222 F.3d at 451.

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy.  **Banks**, 258 F.3d at 824.  See also 20 C.F.R. § 404.1520(f).  The Commissioner may meet his burden by referring to the medical-vocational guidelines (the "Grid") or by eliciting testimony by a vocational expert.  **Pearsall**, 274 F.3d at 1219.  The Grid may not be relied on if the claimant suffers from non-exertional impairments unless those impairments "do not diminish or significantly limit the claimant's [RFC] to perform the full range of Guideline-listed activities[.]"  **Ellis v. Barnhart**, 392 F.3d 988, 996 (8th Cir. 2005) (alterations added; interim quotations omitted).  If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court if it is supported by "substantial evidence on the record as a whole."  **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001); **Clark v. Apfel**, 141 F.3d 1253, 1255 (8th Cir. 1998); **Frankl**, 47 F.3d at 937.  "Substantial evidence is less than a

preponderance but is enough that a reasonable mind would find it adequate to support the decision." **Strongson v. Barnhart**, 361 F.3d 1066, 1069-70 (8th Cir. 2004) (interim quotations omitted). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the court must also take into account whatever in the record fairly detracts from that decision. **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999); **Baker v. Apfel**, 159 F.3d 1140, 1144 (8th Cir. 1998). The court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it "might have decided the case differently," **Strongson**, 361 F.3d at 1070. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." **Wheeler v. Apfel**, 244 F.3d 891, 894-95 (8th Cir. 2000) (alteration added).

Plaintiff argues that the ALJ's adverse decision is not supported by substantial evidence on the record as a whole because (1) the ALJ failed to consider the entire record when assessing his RFC; (2) the ALJ improperly assessed his credibility; and (3) the ALJ erred by relying on the Grid and by not introducing testimony by a vocational expert. The Commissioner disagrees.

As noted above, "[w]hen determining a claimant's RFC, the ALJ must consider all relevant evidence, including the claimant's own description of her or his limitations, as well as medical records, and observations of treating physicians and others." **Roberson v. Astrue**, 481 F.3d 1020, 1023 (8th Cir. 2007) (alteration added).

Plaintiff alleged he was unable to work as of December 10, 2002; however, he did work after that and left this later job because he could not perform a task, i.e., heavy lifting, that was not anticipated and is not in his RFC as determined by the ALJ. "Absent a showing of deterioration, working after the onset of an impairment is some evidence of an ability to work." **Schultz v. Astrue**, 479 F.3d 979, 982-83 (8th Cir. 2007). He worked at this later job in the early months of 2004. That summer, his hypertension and hypothyroidism were described as "well controlled"; his degenerative joint disease as "controlled"; and his depression as "not currently being treated." The month after these observations were made, Plaintiff consulted the physicians at the VA orthopedic clinic for right shoulder and bilateral knee pain. The pain in his shoulder he attributed to having to lift 85-pound bags – an exertional limitation accommodated in the ALJ's RFC. After several physical therapy

sessions, his pain was "much improved" and he was able to play darts.  His goal was to be pain free; he was described as meeting that goal.  "'If an impairment can be controlled by treatment or medication, it cannot be considered disabling.'"  **Id.** at 983 (quoting Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004)).

The Court notes that Plaintiff's reports of improvement in his shoulder, knee, hip, or back pain to his physicians and therapists are sometimes followed by subsequent visits with reports of such pain.  For instance, he had no complaints of knee or shoulder pain in August; the following month, he did.  He was not then, however, taking his medication and he later reported that his shoulder pain was exacerbated by playing darts, a restriction that is consistent with the ALJ's RFC.

Plaintiff argues that, when assessing his RFC, the ALJ did not accurately weigh the information from the vocational counselors, the disability rating from the VA, or his credibility.

The information from the vocational counselors may be used "'to show the severity of [a claimant's] impairment(s) and how it affects [his] ability to work.'"  **Lacroix**, 465 F.3d at 886-87 (quoting 20 C.F.R. §§ 404.1513(d), 416.913(d)) (alterations added).  See also Social Security Ruling 06-3p, 41 Fed.Reg. 45593 (Aug. 9, 2006) (setting forth factors to be considered when evaluating opinions from medical and non-medical sources).  "For opinions from sources such as . . . counselors, and social workers who are not medical sources . . ., it would be appropriate to consider such factors as the nature and extent of the relationship between the source and the individual, the source's qualifications, the source's area of

speciality or expertise, the degree to which the source presents relevant evidence to support his or her opinion, whether the opinion is consistent with other evidence, and any other factors that tend to support or refute the opinion." Id. at 44596 (alterations added).  The ALJ did consider whether the opinion was consistent with other evidence – it was not.  There was no evidence of the source's area of expertise or qualifications.  And, although the letters did state the duration of the program and describe Plaintiff's limitations, there was no evidence of whether those limitations were observed by the source or were a report of Plaintiff's self-described limitations.  Moreover, even with medical sources, the question whether a claimant is able to return to work "'involves an issue reserved for the Commissioner,'" as recognized by the ALJ.  **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005) (quoting Ellis, 392 F.3d at 994).  See also **Garza v. Barnhart**, 397 F.3d 1087, 1088 (8th Cir. 2005) (per curiam) (rejecting claimant's argument that ALJ improperly disregarded opinion of treating social worker; worker attached no treatment records to support conclusions, which conflicted with those of a consulting psychiatrist whose findings were supported by testing).

The ALJ found that the VA's disability decision was not controlling.  The evidence before the ALJ was that Plaintiff had been found 100% disabled by the VA in November 2004.  This finding is not binding on the ALJ.  See 20 C.F.R. § 404.1504; **Jenkins v. Chater**, 76 F.3d 231, 233 (8th Cir. 1996); **Fisher v. Shalala**, 41 F.3d 1261, 1262 (8th Cir. 1994) (per curiam).  "[A] VA finding [is, however,] important enough to deserve explicit attention."  **Morrison v. Apfel**, 146 F.3d 625, 628 (8th Cir. 1998) (alterations added).

Plaintiff argues that the ALJ erred by not discussing the VA's finding. Similarly, the claimant in **Pelkey v. Barnhart**, 433 F.3d 575 (8th Cir. 2006), argued that the ALJ had improperly failed to consider the VA's rating decision of a 60 percent disability. **Id.** at 579. The Eighth Circuit disagreed, noting that, although "[t]he ALJ should consider the VA's finding of disability . . . the ALJ is not bound by the disability rating of another agency when he is evaluating whether the claimant is disabled for purposes of social security benefits." **Id.** (alterations added). See also **Andler v. Chater**, 100 F.3d 1389, 1391 n.3 (8th Cir. 1996) ("[T]he standards for VA disability do not mirror those for Social Security disability.") (alteration added). The court in **Pelkey** held that the ALJ's failure to specifically mention the VA's rating decision was not fatal "because [the ALJ] fully considered the evidence underlying the VA's final conclusion that [the claimant] was 60 percent disabled." 433 F.3d at 579. In so holding, the court specifically rejected the claimant's argument that **Morrison** mandated an express reference to the VA's rating decision. **Id.** at 579-80. In the instant case, Plaintiff does not argue that the VA's decision was based on evidence not considered by the ALJ.

Plaintiff further argues that the ALJ improperly assessed his credibility[10] when evaluating his RFC.

---

[10]A portion of this argument appears to be in error, see page 26 of Plaintiff's brief, as it refers to a female claimant and to considerations not relevant in the instant case. This error does not affect the scope or outcome of the Court's review.

"'Where adequately explained and supported, credibility findings are for the ALJ to make.'" **Ellis**, 392 F.3d at 996 (quoting Lowe, 226 F.3d at 972).

The ALJ began her credibility determination with a discussion of the medical evidence. "Although 'an ALJ may not disregard [a claimant's] subjective pain allegations solely because they are not fully supported by objective medical evidence, an ALJ is entitled to make a factual determination that a [c]laimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary.'" **Gonzales v. Barnhart**, 465 F.3d 890, 895 (8th Cir. 2006) (quoting Ramirez, 292 F.3d at 581) (alterations in original). Accord **Baker v. Barnhart**, 457 F.3d 882, 892-93 (8th Cir. 2006); **Strongson**, 361 F.3d at 1072. Plaintiff's medical records consistently reflect improvement of his pain when he participated in physical therapy or was compliant with his medication and home exercise program. They also reflect that reoccurrence of pain was caused by an activity outside of his description of his severely-restricted activities, e.g., back pain following shoveling rock or right shoulder pain when playing darts or washing his car. See **Guilliams v. Barnhart**, 393 F.3d 798, 802 (8th Cir. 2005) ("Evidence of effective medication resulting in relief . . . may be inconsistent with claims of disabling pain.") (alteration added); **Rankin v. Apfel**, 195 F.3d 427, 429 (8th Cir. 1999) (finding that positive results of treatment undercut complaints of disabling pain); **Hutton v. Apfel**, 175 F.3d 651, 655 (8th Cir. 1999) ("Impairments that are controllable or amenable to treatment do not support a finding of total disability."). The ALJ did not err in considering the lack of supporting objective medical evidence when evaluating Plaintiff's

complaints.[11]  See, e.g. **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006) (finding that ALJ properly considered, inter alia, claimant's limited treatment of symptoms and his ability to control his various ailments through medication).  This lack includes the absence of any permanent restrictions placed on Plaintiff by any of his physicians.  See **Brown**, 390 F.3d at 541 (affirming negative credibility decision by ALJ who noted, inter alia, that claimant's doctor had released her to work with no restrictions after one month).  Indeed, as noted by Plaintiff, Dr. Doerr released him to return to work without restrictions and, as noted by the ALJ, his primary care physician refused to excuse him from jury duty.  See **Tucker v. Barnhart**, 363 F.3d 781, 783 (8th Cir. 2004) (finding that ALJ properly questioned credibility determination of claimant whose medical records showed relatively minor degenerative changes and whose physicians did not place any restrictions on him despite allegations of severe pain); **Depover v. Barnhart**, 349 F.3d 563, 567 (8th Cir. 2003) (affirming adverse credibility finding based in part on lack of any opinion by claimant's treating physicians that claimant was disabled).

The ALJ also properly considered that when Plaintiff left his job in December 2002 it was because they could not accommodate his restriction – no climbing ladders – and not because he was unable to work at all.  "Courts have found it relevant to credibility when a claimant leaves work for reasons other than [his] medical condition." **Goff v. Barnhart**, 421

---

[11]Plaintiff refers in his supporting brief to syncope as an impairment.  The medical evidence reflects that he had one syncopal episode when he arose too quickly from a chair to answer the telephone and denied having any subsequent episodes.

F.3d 785, 793 (8th Cir. 2005) (holding that fact that claimant stopped working because she was fired for slapping patient was properly considered by ALJ as a detraction from her credibility and noting other Eighth Circuit case affirming ALJ's negative credibility assessment of claimant who lost job because position was eliminated and not because of disability) (alteration added); **Black v. Apfel**, 143 F.3d 383, 387 (8th Cir. 1998) (ALJ properly considered fact that claimant was laid off from position rather than forced out due to her impairments as a consideration weighing against her credibility). Leaving work for a reason unrelated to his impairments also offsets Plaintiff's good work history. See **Id.**

Another consideration when evaluating Plaintiff's credibility is his daily activities. **Ramirez**, 292 F.3d at 581. Plaintiff described activities primarily limited to driving, watching television, and sleeping. His reports to doctors included swimming, washing his car, and playing darts. Regardless of whether Plaintiff's daily activities could be construed as supporting Plaintiff's claims, "[t]he ALJ was not obligated to accept all of [Plaintiff's] assertions concerning those limitations." **Ostronski v. Chater**, 94 F.3d 413, 418 (8th Cir. 1996) (alteration added). See also **Choate v. Barnhart**, 457 F.3d 865, 871 (8th Cir. 2006) (affirming ALJ's negative assessment of claimant's credibility; claimant's "self-reported limitations" on daily activities were inconsistent with medical record).

As noted above, "[i]t is the claimant's burden to establish [his] RFC at step four." **Masterson v. Barnhart**, 363 F.3d 731, 737 (8th Cir. 2004) (alterations added). For the reasons set forth above, Plaintiff's arguments why the ALJ erred in assessing his RFC are unavailing.

"'[W]hen a claimant's subjective complaints of pain are explicitly discredited for legally sufficient reasons articulated by the ALJ, the [Commissioner's] burden [at the fifth step] may be met by use of the [Medical-Vocational Guidelines].'" **Baker**, 457 F.3d at 894-95 (quoting Naber v. Shalala, 22 F.3d 186, 189-90 (8th Cir. 1994)) (first two alterations added). Therefore, the ALJ did not err in not calling a vocational expert as a witness.

## Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision. "As long as substantial evidence in the record supports the Commissioner's decision, [this Court] may not reverse it [if] substantial evidence exists in the record that would have supported a contrary outcome or [if this Court] would have decided the case differently." **Krogmeier v. Barnhart**, 294 F.3d 1019, 1022 (8th Cir. 2002) (alterations added) (interim citations omitted). Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and that this case is DISMISSED.

An appropriate Judgment shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 11th day of September, 2007.